Cabot Christianson, Esq.
Alaska Bar No. 7811089
LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 W. 8th Avenue, Suite 201
Anchorage, AK 99501
Phone (907) 258-6016
Facsimile (907) 258-2026
Attorneys for Nacole M. Jipping, Trustee

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| In Re:<br><br>OMNI ENTERPRISES, INC.<br><br>Debtor. | **Case No.: 15-00076 HAR**<br><br>Chapter 7 |
| NACOLE M. JIPPING, TRUSTEE,<br><br>Plaintiff,<br>v.<br><br>FIRST NATIONAL BANK ALASKA,<br><br>Defendant, | Adversary Case No.:<br>15-90018 |

**TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

Nacole M. Jipping, Trustee, moves for summary judgment (1) that defendant First National Bank Alaska ("FNBA" or "the Bank") did not have a security interest in the deposit account held by debtor Omni Enterprises, Inc. ("Omni") at the Bank during the ninety days preceding the petition date; (2) that $1,256,504.49 of setoffs by the Bank during the ninety days preceding the petition date are avoidable pursuant to Section 553(b).

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

## *TABLE OF CONTENTS*

I. Facts . . . . . . . . . . 5

II. Overview of the legal issues . . . . . . . . . . 8

III. The 2013 security agreement did not incorporate the 2009 loan documents; and the 2009 security agreement did not extend to the 2013 loan. . . . . . . . . . 9

A. The 2013 security agreement excludes the 2009 loan documents . . . . . . . . . 9

B. The 2009 security agreement did not extend to the 2013 Note . . . . . . . . . . . 13

IV. If this Court concludes that the Bank did not have a security interest in Omni's deposit accounts in 2015, then $1,256,504.49 of the setoffs are avoidable under Section 553(b). . . . . . . . . . . 22

V. Conclusion . . . . . . . . . . 24

## *TABLE OF AUTHORITIES*

*CASES*

*In re Alaska Fur Gallery, Inc.*, 457 B.R. 764 (Bankr. Alaska 2011) . . . . . . . . . 18, 19, 20

*In re Zaochney*, 2011 WL 6148727 (Bankr. Alaska 2011) . . . . . . . . . . 19, 20

*In re Duckworth*, 2013 WL 211231 (Bankr. C. D. Ill. 2013) . . . . . . . . . . 12-14, 20

*In re Dumulao*, 2011 WL 4501402 (9th Cir. BAP 2011) . . . . . . . . . . 18

*FEDERAL STATUTES*

11 U.S.C. § 553(b)(1) . . . . . . . . . . 23

11 U.S.C. §§ 101(32)(A) . . . . . . . . . . 22

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

*STATE STATUTES*

AS 45.29.104(a)(1) . . . . . . . . . . 5

AS 45.29.312(b) . . . . . . . . . . 5

AS 45.29.314. . . . . . . . . . . 5

AS 45.29.513(c) . . . . . . . . . . 16

AS 45.29.904(c) . . . . . . . . . . 18

*OTHER AUTHORITY*

Official Comment 5 to revised U.C.C. § 9-204 . . . . . . . . . . 19

U.C.C. (revised) § 9-204 . . . . . . . . . . 19

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

## I. Facts

On September 2, 2009, Omni borrowed $1,277,883.21 million from FNBA pursuant to a note ("the 2009 Note") in that amount. The 2009 Note was secured by a Commercial Security Agreement ("the 2009 security agreement").[1] The description of collateral in the 2009 security agreement included deposit accounts.

The 2009 Note was perfected by a 2009 UCC-3 financing statement amendment[2] which amended the description of collateral by adding two words, namely "Deposit Accounts," to the list of collateral contained in a pre-existing 2005 UCC-1 financing statement.[3] Technically speaking, the addition of "deposit accounts" in 2009 was superfluous, since perfection of deposit accounts is accomplished by control, not by a UCC-1 filing.[4] However, from the standpoint of the intention of the parties, the 2009 UCC-3 amendment affirmatively demonstrates that the Bank regarded deposit accounts as part of its collateral for the 2009 loan.

In 2010, a UCC-3 amendment[5] was filed to extend the 2005 UCC-1, as amended in 2009.

In July 2011, Omni paid the 2009 Note in full. After this payoff, Omni had no loans of any kind outstanding to FNBA. Conversely, FNBA had no obligation to Omni

---

[1] Exhibit A hereto is the 2009 security agreement.

[2] Exhibit C hereto is the 2009 UCC-3 amendment.

[3] Exhibit B hereto is the 2005 UCC-1 financing statement.

[4] AS 45.29.104(a)(1), AS 45.29.312(b), and AS 45.29.314.

[5] Exhibit D hereto is the 2010 UCC-3 extension.

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

to make an advance incur an obligation, or otherwise give value to Omni. Immediately thereafter, in 2011 FNBA filed a UCC-3 termination statement[6] which terminated the 2005 UCC-1 financing statement as well as the 2009 UCC-3 collateral amendment whose sole purpose had been to amend the collateral description to include deposit accounts.

On August 13, 2013, more than two years after the 2009 Note had been paid off, Omni borrowed $2,575,520 million from FNBA to purchase fixtures and equipment at Omni's store in Bethel, Alaska. The loan was evidenced by a note in that amount ("the 2013 Note"). In connection with that loan, Omni executed a new Commercial Security Agreement ("the 2013 security agreement"). The 2013 security agreement does *not* include deposit accounts as collateral,[7] but it does give the Bank setoff rights in Omni's bank accounts.

FNBA filed a UCC-1 financing statement (No. 2013-765704-5)[8] for the 2013 security agreement; that financing statement also did not include deposit accounts as collateral.

In December 2014, the parties modified the loan payment terms of the 2013 loan in a Change of Terms Agreement ("CTA").[9] The CTA did not change the description of collateral securing the 2013 Note. The CTA states, in the Description of Collateral

---

6 Exhibit E hereto is the 2011 UCC-3 termination statement.

7 Exhibit F hereto is the 2013 security agreement.

8 Exhibit G hereto is the 2013 UCC-1 financing statement.

9 Exhibit H hereto is the CTA.



LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

section of that agreement, "Specific UCC No. 2013-765704-5" - i.e., the UCC that did not include deposit accounts.

Starting before 2005, and continuously through the petition date, Omni maintained a checking account at FNBA. The documents establishing that account give FNBA setoff rights in that account.

In January, and February 2015, with Omni's authorization,[10] FNBA debited Omni's operating account to pay the two payments due those months on the 2013 Note. By March 2015, Omni's financial situation had become precarious. Omni started depositing its credit card receipts into FNBA, as opposed to its previous credit card depositary bank (Key Bank) out of a fear that Key Bank, whose loan was by then was in default and who was undersecured on a line of credit, would start exercising offset rights.

On about March 11, 2015, a newspaper featured a story about Omni's Bethel store conducting a going out of business sale. Immediately, and without notice to Omni, FNBA used its offset rights on a daily or twice-daily basis[11] to clean out the account which was being enhanced each day with liquidation proceeds. The bank applied those funds to pay down the balance on the 2013 Note, despite that the 2013 Note was already current. It took Omni management a few days to figure out what was happening, and

---

[10] The auto-debit document evidencing such authorization is Exhibit 2 to the Bank's answer in this case, Docket No. 5.

[11] Not counting the regular interest-only payments that were authorized by the auto-debit, there were three setoffs (two principal reductions and one setoff applied to interest) on March 11. There were two setoffs (one principal reduction and one setoff applied to interest) on March 12, on March 13, and on March 17. See Exhibit I, the Bank's loan statement.

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

then steer the credit card deposits into yet a different bank. Between March 11, 2015, and March 17, 2015, FNBA set off more than $1.3 million from the account, and applied those proceeds to the 2013 Note.

Omni filed Chapter 7 on March 31, 2015.

**II. Overview of the legal issues**

The key issue in this case is whether the Bank had a security interest in the Omni deposit account in early 2015. The Bank says that the withdrawals in early 2015 from Omni's bank account were in the nature of a foreclosure of a security interest granted in 2009, not an exercise of offset rights in 2015. If the Bank is correct on this point, then the Trustee acknowledges that she cannot avoid the Bank's withdrawals.

Conversely, the parties both agree that, if the Bank did *not* have a security interest in the bank account in early 2015, then the Trustee is entitled to recover $1,256,504.49 under Section 553(b). Section IV of this brief contains the math and legal reasoning that arrives at this number; the Bank agrees that, if it loses the security interest argument, then the $1,256,504.49 figure is correct.

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

**III. The 2013 security agreement did not incorporate the 2009 loan documents; and the 2009 security agreement did not extend to the 2013 loan.**

The 2009 security agreement includes deposit accounts, but the 2013 security agreement does not. That much is certain.

But beyond that, the integration clause in the 2013 security agreement excludes the 2009 security agreement as loan document for purposes of the 2013 Note. Therefore, even if the 2009 security agreement could somehow be stretched to cover the 2013 Note, the integration clause in the 2013 security agreement trumps the 2009 security agreement with respect to the scope of collateral for the 2013 Note.

Moreover, the 2009 security agreement does not collateralize the the 2013 Note in the first place, because the 2009 security agreement specifically provides that it terminates once the Indebtedness, a defined term, is paid in full - and that happened in 2011, two years before the 2013 Note was executed.

**A. The 2013 security agreement excludes the 2009 loan documents**

The 2013 security agreement begins by stating that "Grantor grants to the Lender a security interest in the Collateral to secure the Indebtedness..." There is no provision of the 2013 security agreement that expands the description of Collateral to include deposit accounts, or that incorporates by reference the collateral provisions of the 2009 security agreement or any other prior document. The 2013 security agreement contains a garden

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

variety "Right of Setoff" provision[12] that does not purport to grant a security interest in accounts.

The 2013 security agreement has an integration clause, which states:

> **This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.** No alteration or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment. (emphasis added)

The term "Agreement" in the 2013 security agreement means only the 2013 security agreement.[13] The term "Related Documents" includes only those documents executed "in connection with the Indebtedness."[14]

The term Indebtedness is defined as follows:

> **Indebtedness** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest

---

[12] **"Right of Setoff.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts."

[13] "**Agreement.** The word "Agreement" means this Commercial Security Agreement as this Commercial Security Agreement may be amended from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time." [There are no such exhibits or schedules in this case.]

[14] "**Related Documents**. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness."

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

> together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement. (underline added)

Thus, to determine the scope of the Indebtedness secured by the 2013 security agreement, three sets of definitions or provisions need to be consulted: "the Note or Related Documents," "the Future Advances provision," and "the Cross-Collateralization provision."

In the 2013 security agreement, the "Note" refers solely to the 2013 Note. The term "Related Documents," defined in footnote 14 of this brief, points the reader to the definition of Indebtedness, so the portion of the definition of Indebtedness that points back to Related Documents can be ignored as circular. Both the "Future Advances" provision[15] and "Cross-Collateralization" provision[16] refer solely to the future after

---

15 "**FUTURE ADVANCES**. In addition to the Note, this Agreement secures all future advances made by lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes."

16 "**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or anyone or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable."

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

2013, not the past going back to 2009, so neither of these clauses give the Bank any help.

So, regardless of what the 2009 security agreement says or how that agreement might be construed, the integration clause in the 2013 security agreement unambiguously states that it represents the entire agreement of the parties. The integration clause forbids the parties from trying to bootstrap the provisions of the 2009 security agreement into the 2013 loan. The 2013 security agreement gives the Bank a right of setoff, but not a security interest, in deposit accounts.

Integration clauses mean what they say. For example, in *In re Duckworth*, 2013 WL 211231 (Bankr. C. D. Ill. 2013), there was an integration clause that was word-for-word identical with the integration clause in the Omni 2013 security agreement (because both documents were generated by the same Laser Pro document system), but the security agreement in *Duckworth* lacked a future advances clause. The lender in *Duckworth* tried to stretch the security agreement to encompass a subsequent loan, but the court ruled against the lender.[17]

The parties' conduct after the 2013 Note and 2013 security agreement were executed lends further support to the proposition that the parties did not intend for the 2013 Note to be secured by deposit accounts.

The December 2014 CTA - a document whose sole purpose was to adjust downward the payment terms of the 2013 Note, and a document that gave the bank an

---

[17] "The TRUSTEE maintains that the CSA's clearly and unambiguously do not contain dragnet clauses and that each CSA collateralized only the note specifically identified in that agreement. The TRUSTEE is correct." *Duckworth* at p. 3.



LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

opportunity to take a hard second look at its collateral - states in the "Description of Collateral" section: "Specific UCC No. 2013-765704-5." This UCC-1 financing statement does not mention deposit accounts as collateral. It is not relevant that a security interest is *perfected* by control, because a "description of collateral" refers to what extent a security interest *exists.* It is clear that the bank did not believe, in December 2014, that it had a security interest in Omni's deposit accounts.

**B. The 2009 security agreement did not extend to the 2013 Note**

By its terms, the 2009 security agreement does not extend to the 2013 Note. The 2009 security agreement starts with the same boilerplate "Grantor grants to the Lender a security interest in the Collateral to secure the Indebtedness..."

As has already been explained, "Indebtedness" is a defined term which requires to the reader to consult three sets of definitions or provisions: "the Note or Related Documents," "the Future Advances provisions," and "the Cross-Collateralization provision."

The term "Note" in the 2009 security agreement refers simply to the 2009 Note for $1,277,883.21. As already explained, the term "Related Documents" un-usefully simply points back to the Indebtedness.[18] In the *Duckworth* case previously discussed, the case involving exactly the same definitions of "Indebtedness" and "Related Documents" as the 2009 security agreement, the court rejected the lender's arguments

---

[18] Footnote 14 above quotes the definition of Related Documents in the 2009 security agreement; the 2013 security agreement contains the same definition, word for word.

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

that those terms were expansive in nature, saying "The Court agrees with [the bankruptcy trustee] that the definitions are circular and do not, by their plain terms, encompass any future debts", 2013 WL 211231, p. 6.

Because 2013 is in the future, from the standpoint of 2009, but not vice versa, the Future Advances provision deserves closer scrutiny in analyzing the 2009 security agreement than when analyzing the 2013 security agreement. That provision provides:

> **FUTURE ADVANCES**. In addition to the Note, this Agreement secures all future advances made by lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

On a first reading, provision phrase "a)" appears to have no relevance to the case at bar, because there was never a commitment to make a future advance. But this definition does serve as a reminder that the 2009 security agreement is a form document which is designed to be utilized both in situations where there is a commitment to make future advances, and also in situations - such as the case at bar - where there is no such commitment. The relevance of this reminder will soon become clear.

The Cross-Collateralization section of the 2009 security agreement is the same as in the 2013 agreement:

> **CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or anyone or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

> otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

With these definitions in mind, we can now answer the question, whether the Indebtedness was paid in full, in July 2011 after the 2009 Note was paid off. It is undisputed that at that time, there was no obligation under the Note or Related Documents; it is also undisputed that at that time, there was no obligation due under the Future Advances clause or under the Cross-Collateralization clause.

The Bank's answer in this case acknowledges as much: in paragraph 12 of its answer, the Bank admits that "Omni had timely satisfied the 2009 loan."[19]

Therefore, as a matter of law, the Indebtedness was "paid in full," in July 2011 after the 2009 Note was paid.

The significance of Omni's Indebtedness being paid in full as of July 2011, is that at that time all security interests granted under the 2009 security agreement ceased to exist. This is true because of the so-called "survival clause"[20] which provided:

---

19 The full paragraph 12 states: "FNBA denies the allegations in paragraph 12 of the Complaint; FNBA avers further that there was no statute of limitations applicable to any contract between Omni and FNBA at any time until Omni defaulted on the 2013 loan because **Omni had timely satisfied the 2009 loan** and the time period of any statute of limitations begins to run only if and when all elements of a claim or cause of action, including breach of contract, have occurred, and these elements did not occur until Omni defaulted on the 2013 loan" (emphasis added)

20 A better term might be "termination clause" because, the clause explains when the security agreement terminates. But the clause's heading is "Survival of Representations and Warranties," and therefore this brief uses the term survival clause.



LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

> **Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full. (underline added).

Therefore, in July 2011, the survival clause kicked in, and the security interest granted by the 2009 security agreement terminated as of that time.

In an effort to avoid this result, the Bank points to the last sentence of a paragraph containing the heading "Perfection of Security Interests:"

> **Perfection of Security Interest**. Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender. (underline added)

At first blush, this last sentence appears to conflict head-on with the survival clause: the survival clause states that the security interest expires when the Indebtedness is paid off, but the underlined sentence just quoted seems to say that the security interest can continue even if there is no Indebtedness. Also, it seems odd for the security agreement to be discussing the existence of a security interest, in a section of the agreement concerning perfection.

But properly understood, there is no conflict between the survival clause and the perfection section, and there is only one explanation for a discussion about security interests in a paragraph addressed to perfection. AS 45.29.513(c) provides that a lender



LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

must terminate its financing statements unless there is still a "commitment to make an advance, incur an obligation, or give value."[21] As noted above when the Future Advances clause was discussed, this security agreement is an all-purpose form that is designed, among other things, to be used when there is a commitment for a future advance. The last sentence of the Perfection of Security Interests paragraph is also designed for the case in which there is a commitment in place for future advances, but there is no actual unpaid advance. But because there is no commitment for future advances in the Omni/FNBA 2009 credit facility, the underlined sentence of the Perfection of Security Interests has no application to this case.

The 2009 and 2013 security interests in this case are to be interpreted according to Alaska law,[22] but there is no Alaska state case on whether a security agreement can secure a subsequent loan, where the subsequent loan was made after the time the original loan was paid off, and where the lender was under no commitment to make the subsequent loan or otherwise extend new value. Undersigned has been unable to locate a case from any other jurisdiction on these same facts.

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

---

[21] AS 45.29.513(c) provides in relevant part that "In [nonconsumer] cases ... within 20 days after a secured party receives an authenticated demand from a debtor, the secured party shall ... send to the debtor a termination statement ... if (1) ...there is no obligation secured by the collateral covered by the financing statement and no commitment to make an advance, incur and obligation, or otherwise give value".

[22] In *In re Dumulao*, 2011 WL 4501402 (9th Cir. BAP 2011), an unpublished case also involving UCC section 9-204, the court observed that "[s]tate law controls the construction of a contract," p. 4, and looked to Nevada law.

FNBA relies on an Alaska bankruptcy case, *In re Alaska Fur Gallery, Inc.* 457 B.R. 764 (Bankr. Alaska 2011). In *Alaska Fur Gallery*, the debtor obtained an operating loan from FNBA in 2002 secured by a perfected broad form security agreement in business personal property. Then, in 2003 and 2004, the FNBA made two real estate loans to the debtor that each were secured by a deed of trust. The 2002 operating loan was outstanding at the time both real estate loans were made. Later in 2004, the operating line was paid off, and the only remaining obligations to the bank were the real estate loans. Nonetheless, the bank filed a 2008 UCC-1 continuation statement. The question was whether the cross collateralization clause in the 2002 security agreement gave the bank a security interest in debtor's inventory as additional security for the two real estate loans. The bankruptcy court said yes, holding that UCC 9-204(c) (Alaska Statute 45.29.904(c)) authorized future advances to be secured by a security agreement.

*Alaska Fur Gallery* is easily distinguished from the case at bar. The *Alaska Fur Gallery* did not involve an integration clause in the "new" loan. And in *Alaska Fur Gallery* the old loan had not been paid off by the time the new loans were made, whereas in Omni's case the old loan had been paid, and the survival clause had kicked in, by the time the new loan was made. Finally, in *Alaska Fur Gallery*, the bank continued to file UCC-1's four years after the old loan was paid off, whereas in Omni's case the bank affirmatively released a UCC-1 that specifically included deposit accounts.

Another Alaska bankruptcy case, *In re Zaochney*, 2011 WL 6148727 (Bankr. Alaska 2011) construes AS 45.29.904 in the consumer context. There, a credit union customer took out a credit line loan which she thought was unsecured, and thereafter

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

financed the purchase of a car, also through the credit union. Both the credit line documents and the car loan documents contained cross-collateralization clauses. The customer then filed bankruptcy, and learned that the credit union claimed that she had to pay off both the credit line loan and the car loan in order to keep the car. She claimed that the true intent of the parties, and considerations of good faith, overreaching, or unconscionability, should cause the bankruptcy court to conclude that the credit line loan was not secured by the car. Judge MacDonald, who had decided *Alaska Fur Gallery* a few months prior, also ruled against Ms. Zaochney, held that AS 45.29.904 required the cross collateralization clauses to be enforced.

In both *Alaska Fur Gallery* and *Zaochney*, the words in the loan documents supported the lender's position, and the court enforced the loan documents. In the case at bar, in contrast, the words in the loan documents support the trustee's position, and this Court should similarly enforce the loan documents.

*Alaska Fur Gallery*, *Zaochney,* and other cases that construe section 9-204 of the revised Uniform Commercial Code, quote Official Comment 5 to the revision to that section.[23] Comment 5 states:

> [C]ollateral may secure future as well as past or present advances if the security agreement so provides. This is in line with the policy of this Article toward security interests in after-acquired property under subsection (a). Indeed, the parties are free to agree that a security interest secures any obligation whatsoever. Determining the obligations secured by collateral is solely a matter of construing the

[23] *In re Dumaleo*, 2011 WL 4501402, p. 5 (9th Cir. BAP 2011) (unpublished), "We have previously recognized the usefulness of the Official Comments in interpreting the U. C. C.," citing to *NetBank, FSB v. Kipperman*, 350 B.R. 465, 475 (9th Cir. BAP 2006).

> parties' agreement under applicable law. This Article rejects the holdings of cases decided under former Article 9 that applied other tests, such as whether a future advance or other subsequently incurred obligation was of the same or a similar type or class as earlier advances and obligations secured by the collateral. (underline added)

Comment 5 says that the contract is what the contract is. For example, in *In re Duckworth, supra,* the security agreement did not contain a dragnet or future advances clause. The lender there tried to stretch other sections of the security agreement to collateralize a future advance, but the court interpreted the security agreement as it was written, and held that the security agreement covered only the single debt referenced in that agreement, not the future debt at issue.

That same result should be reached in Omni's case. The Bank's own document states, without any ambiguity, that "All ... agreements made by Grantor in this Agreement ... shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full." In July 2011, after the 2009 Note was paid off, there was no obligation under that note; there were no cross collateralized loans, and neither party had any obligation to each other for future advances. Therefore, at that time there was no Indebtedness, and the grant of security in the 2009 security agreement was of no force and effect.

The Bank's argument, that it holds a security interest in deposit accounts forever and ever, untouched by loan payoff, untouched by Indebtedness payoff, untouched by the survival clause, untouched by the UCC-1 termination statement, is an argument custom-designed for this case, and this case alone. The Bank would never rely upon this argument in any other context. The Bank's argument requires one to believe that the

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

effect of the UCC-1 termination was not to signal an end to the bank's interest in the collateral, but only to convert the bank from perfected to unperfected status with respect to collateral that is perfected by filing, and to remain secured on deposit accounts. The bank does not explain why this bizarre situation could ever be a result intended by the parties.

Imagine the following hypothetical: imagine that in 2013 Omni returned to the bank and asked for a loan, and assume that the Bank and Omni both agreed that the collateral that would secure the new loan would be exactly the same as in 2009 - no more, no less. Under the Bank's argument, there is absolutely no reason in this hypothetical to require Omni to sign a new security agreement. The only documentation that would be required is a new note and a new UCC-1 financing statement. In fact, Omni could come back to the bank decades (or even centuries) later and, according to the Bank, no new security agreement would ever be required unless the parties intended to offer the Bank collateral that was outside the scope of the 2009 security agreement. No loan officer in his right mind would extend a new loan without obtaining a new security agreement, because no loan officer in his right mind would accept the proposition that the old security agreement was still good. But that is exactly what the Bank is arguing to this Court.

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

**IV. If this Court concludes that the Bank did not have a security interest in Omni's deposit accounts in 2015, then $1,256,504.49 of the setoffs are avoidable under Section 553(b).**

If this Court concludes that the Bank did not have a security interest in Omni's bank account in early 2015, then as a matter of law, Trustee is entitled to judgment against the Bank in the amount $1,256,504.49 under Section 553(b). That statute gives a trustee something akin to preference recovery rights against a bank that uses its right of setoff to improve its position (i.e., if the bank reduces its exposure, or "insufficiency)" during the 90 days preceding the petition. "Insufficiency" on any given date means the amount Omni owed the Bank on that date, minus the amount in Omni's checking account on that date. Section 553(b) provides:

> (1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, 561, 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—
>
> (A) 90 days before the date of the filing of the petition; and,
>
> (B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.
>
> (2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

The basic predicates of the statute are easily satisfied. FNBA was a creditor of Omni at the time of the setoffs within the meaning of 11 U.S.C. §§ 101(32)(A). For

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

purposes of 11 U.S.C. § 553(b)(1), FNBA and Omni owed each other mutual obligations, in that FNBA owed Omni payment of the funds Omni held in its account at FNBA and Omni owed FNBA the payments due under the 2013 Note, as modified by the CTA.

December 31, 2014, the 90th day prior to the March 31, 2015 petition date, is the benchmark date against which the Bank's subsequent improvements in position are measured. On that day, December 31, 2014, Omni had $87,491.97 on deposit in the FNBA bank account,[24] and owed FNBA $2,510,926.44 principal, plus accrued interest.[25] Therefore, the insufficiency on that day, was in excess of $2,423,434.47 ($2,510,926.44 principal, plus accrued interest, less $87,491.97).

During the ninety days before the Petition Date, and as detailed in Exhibit J hereof, FNBA set off against Omni's checking account at FNBA, a total of $1,364,002.51 which FNBA applied to Omni's loan with FNBA.

To the extent that FNBA improved its position on a particular setoff day as compared to December 31, 2014 - i.e., the extent to which the insufficiency on that setoff day was less than $2,423,434.47 - the Trustee is entitled to recover each such setoff.

The bank's loan statement, Exhibit I, shows the loan balances on each setoff day. Omni's bank statements[26] show the balances in Omni's checking accounts for each setoff day. As detailed on the spreadsheet at Exhibit J hereto, the following setoffs are

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

---

[24] See the December, 2015 bank statement for the bank account, Exhibit K.

[25] See Exhibits H and I.

[26] Exhibits K, L, M and N are the bank statements for the Omni bank account for the months of December 2014, January 2015, February 2015, and March 2015 respectively.

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

recoverable under §553(b) because in each case, FNBA improved its position relative to December 31, 2014:

| ***Recoverable Setoff*** | ***Date of Setoff*** |
|---|---|
| $ 12,648.79 | February 17, 2015 |
| $ 543,237.54 | March 11, 2015 |
| $ 288,283.46 | March 12, 2015 |
| $ 199,800.00 | March 13, 2015 |
| $ 138,264.70 | March 16, 2015 |
| $ 74,270.00 | March 17, 2015 |
| ***$1,256,504.49*** | ***Total*** |

## V. Conclusion

The 2013 Note was not secured by Omni's deposit accounts. Neither the 2013 security agreement or any other loan document executed in connection with that loan - including the CTA which was executed after the loan became troubled - references deposit accounts as part of the Bank's collateral. The integration clause in the 2013 security agreement forecloses the Bank from incorporating any other documents into the 2013 loan.

Separate and apart from the integration clause in the 2013 loan documents, the 2009 security agreement means what it says and says what it means, namely that once the Indebtedness - meaning the 2009 note, and any subsequent advances or loans - are paid off, the 2009 security agreement terminates. FNBA's release of its financing statements

that specifically mention deposit accounts is further evidence that that was the intent of the parties.

The Bank's argument, that the 2009 security agreement covered the 2013 Note, has no support in the documentation for either loan, and also has no basis in common sense. Under the Bank's argument, a paid-off security agreement can lie dormant for years, decades, or even centuries, and like a vampire that cannot be killed because it is already dead, operate to secure a new loan, regardless of what the new loan documents say.

This case presents a classic example of why Section 553(b) exists. Omni, pressured by its creditors, changed its normal banking practices and dumped more than $1 million into its FNBA checking account in the space of a few days. FNBA exercised its setoff rights, and helped itself to those funds. Now, the Trustee seeks to recover those funds for the benefit of the general unsecured creditor body. Once this Court concludes that the 2013 Note is not secured by deposit accounts, then Section 553(b) authorizes the avoidance of setoffs in the amount $1,256,504.49.

RESPECTFULLY submitted on March 24, 2016.

LAW OFFICES OF
CABOT CHRISTIANSON, PC
Attorneys for Nacole M. Jipping, Trustee

By: /s/ Cabot Christianson
Cabot Christianson

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026

List of Exhibits

| | |
|---|---|
| A | 2009 Commercial Security Agreement |
| B | 2005 UCC-1 financing statement |
| C | 2009 UCC-3 amendment |
| D | 2010 UCC -3 extension |
| E | 2011 UCC-3 termination |
| F | 2013 Commercial Security Agreement |
| G | 2013 UCC-1 financing statement |
| H | 2014 Change In Terms Agreement |
| I | FNBA loan statement |
| J | Spreadsheet summarizing avoidable setoffs |
| K | December 2014 bank statement |
| L | January 2015 bank statement |
| M | February 2015 bank statement |
| N | March 2015 bank statement |

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 24, 2016, a true and correct copy of the above document was served by electronic means through the ECF system as indicated on the Notice of Electronic Filing.

By: /s/ Margaret Stroble
Margaret Stroble

LAW OFFICES OF CABOT CHRISTIANSON, P.C.
911 WEST 8TH AVENUE, #201 • ANCHORAGE, ALASKA 99501
(907) 258-6016 • Fax (907) 258-2026