Dennis G. Fenerty
Alaska Bar No. 8310117
GROH EGGERS, LLC
2600 Cordova Street, Suite 110
Anchorage, AK 99503
fenertyd@groheggers.com
Phone: (907) 562-6474
Fax: (907) 562-6044

Attorneys for Defendant First National Bank Alaska

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| In re: | ) | Case No. 15-00076 **HAR** |
| | ) | Chapter: 7 |
| Omni Enterprises, Inc. | ) | |
| | ) | |
| Debtor | ) | |
| ______________________________ | ) | |
| | ) | |
| Nacole M. Jipping, Trustee, | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Case No. 15-90018 |
| v. | ) | |
| | ) | |
| First National Bank Alaska, | ) | |
| Defendant | ) | |
| ______________________________ | ) | |

**FNBA'S BRIEF IN OPPOSITION TO TRUSTEE'S MOTION FOR SUMMARY JUDGMENT <u>AND</u> FNBA'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

## I. **Summary of FNBA's Argument in Support of Summary Judgment**.

The parties are agreed that this case presents a single issue involving interpretation of a contract, the Commercial Security Agreement dated September 2, 2009 (the "<u>2009 Security</u>

Agreement") (*see*, Ex. A to Trustee's Brief)[1] that created a lien under the Uniform Commercial Code (the "UCC") in favor of First National Bank Alaska ("FNBA") against the deposit accounts of Omni Enterprises, Inc. ("Omni"). FNBA's position, supported by a bankruptcy court decision that is directly on point and by Alaska Supreme Court decisions, is that the 2009 Security Agreement remained extant and enforceable to secure FNBA's 2013 Loan to Omni. FNBA should prevail on the merits because (1) the express language of the 2009 Security Agreement supports FNBA's interpretation, (2) the applicable UCC provision and its Official Comment support FNBA's interpretation, and (3) the case law of both the US Bankruptcy Court for the District of Alaska and the Alaska Supreme Court support FNBA's interpretation. To rule for the Trustee here, the Court must disregard persuasive and well-reasoned case law, the UCC and its Official Comment, and specific relevant language from the contract at issue that is directly on point. This the Court should not do.

## II. Statement of Facts Supplementing Trustee's Statement.

FNBA recites some relevant facts that overlap with the Trustee's recitation of undisputed facts.[2] In connection with a 2005 loan, FNBA took a security interest in Omni's "Inventory, Chattel Paper, Accounts, Equipment and General Intangibles" and perfected that security interest

---

[1] With only two exceptions, the Trustee has attached all documents discussed in this Brief to the Trustee's Brief. FNBA does not again attach any documents that are already before the Court but refers to two documents attached to FNBA's Answer and Errata. FNBA understands that all documents are admitted for the Court's consideration.

[2] The facts are not disputed; what may be disputed are the legal consequences that flow from the undisputed facts. For example, FNBA did not "use its set-off rights" (Trustee's Brief, p. 7) when it tapped Omni's deposit account in March 2015, it exercised UCC lien rights.

by filing a UCC financing statement on October 3, 2005. *See*, Ex. B to Trustee's Brief. Continuing the lender-borrower relationship between FNBA and Omni, FNBA made a subsequent loan to Omni in 2009. In connection with the 2009 loan, Omni executed the 2009 Security Agreement that again granted FNBA a security interest in Omni's inventory, chattel paper, accounts, equipment and general intangibles, and also added the lien against Omni's "Deposit Accounts". Although the only way to perfect a security interest in deposit accounts is by control,[3] which FNBA had as a matter of law as the bank with which the deposit account was maintained,[4] FNBA also unnecessarily amended its 2005 financing statement to add "Deposit Accounts" to the collateral description by a UCC financing statement amendment filed on September 3, 2009.[5] *See*, Ex. C to Trustee's Brief. On July 13, 2010, FNBA filed a continuation of the 2005 Financing Statement. *See*, Ex. D to Trustee's Brief.

On March 25, 2011, a take-out lender wired funds to pay off FNBA's 2009 loan.[6] On June 15, 2011, FNBA filed a UCC financing statement amendment (termination) (the "2011 Termination Statement") (*see*, Ex. E to Trustee's Brief) which terminated the **"effectiveness"** of the 2005 financing statement (the one that had perfected FNBA's security interest in Omni's "Inventory, Chattel Paper, Accounts, Equipment and General Intangibles"). The 2011 UCC

---

[3] AS 45.29.312(b)(1).

[4] AS 45.29.314 and AS 45.29.104(a)(1).

[5] The Trustee herself acknowledges that the UCC Amendment adding Deposit Accounts was "superfluous". Trustee's Brief, p. 5.

[6] A copy of FNBA's wire transfer receipt of funds paying off the 2009 loan is attached to this Brief as Ex. A; this document was previously shared with counsel for the Trustee and he has acknowledged the document.

Termination Statement did **not** refer to the 2009 amendment that added "Deposit Accounts". The 2011 Termination Statement could not terminate the "effectiveness" of a financing statement purporting to perfect an interest in deposit accounts because such a security interest is perfected only by control, not by filing a financing statement.[7] The 2009 Security Agreement itself was never terminated, and FNBA continued to maintain control over Omni's deposit account by virtue of being the bank with which the deposit account was maintained. The purpose and effect of the 2011 Termination Statement was to elevate the take-out lender's lien against Omni's Inventory, Chattel Paper, Accounts, Equipment and General Intangibles to first lien position, as the take-out lender required, and it fulfilled FNBA's obligations to Omni and to the take-out lender to release its lien against the take-out lender's collateral. *See*, Security Agreement and Financing Statement of Alaska Growth Capital BIDCO, Inc., Ex. 3 to FNBA's Answer and to FNBA's Errata, both filed in this Adversary Proceeding. The take-out lender, Alaska Growth Capital BIDCO, Inc. (*see*, wire transfer receipt attached hereto as Ex. A), was not a depository bank and did not take a lien against Omni's deposit accounts (*see*, Security Agreement and Financing Statement of Alaska Growth Capital BIDCO, Inc., Ex. 3 to FNBA's Answer and FNBA's Errata), leaving FNBA free to retain its lien against Omni's deposit accounts, as it did.

Perpetuating the lender-borrower relationship with Omni that started with the 2005 loan (or before) and continued with the 2009 loan, what should come as no surprise to anyone at all because it was a continuation of the lender-borrower relationship evidenced by the series of loans

---

[7] As noted in footnote 4 above, the Trustee herself acknowledges that the UCC Amendment adding Deposit Accounts was "superfluous". Trustee's Brief, p. 5.

between them (in 2005, in 2009, and now in 2013), FNBA made yet another loan to Omni on August 13, 2013,[8] a little over two years after the 2009 loan was paid off by the take-out lender (on March 25, 2011).

The 2013 loan was targeted specifically to finance purchase of new equipment for a new Omni store location in Bethel, Alaska. The loan was so specifically targeted to this purchase money financing for Omni's equipment that FNBA attached Omni's "shopping list" of equipment to the 2013 loan Security Agreement and UCC Financing Statement to describe the collateral, showing just how focused the parties were on covering the newly purchased items of equipment. *See*, Exs. F and G to Trustee's Brief. FNBA continued to have a perfected security interest in Omni's deposit account at the time of the 2013 loan and after.

In March 2015, after Omni defaulted on FNBA's 2013 loan (with a then-balance in excess of $2.5 million) by having a "fire-sale" at the Bethel location FNBA had equipped with the 2013 purchase money loan, FNBA exercised its UCC lien rights against Omni's deposit account, capturing about $1.364 million which FNBA applied against Omni's 2013 loan. The Trustee now seeks to recover about $1.256 million of the amount FNBA captured from Omni's deposit account.

## III. Argument Supporting Summary Judgment in Favor of FNBA.

### a. Alaska State Law, Standard for Contract Interpretation.

The parties agree that this contract is interpreted under Alaska law. *In re: Alaska Fur Gallery, Inc., Alaska Fur Gallery and Hernandez & Associates, LLC v First National Bank*

[8] This is the loan against which FNBA applied the funds it captured from Omni's deposit account that the Trustee seeks to recover in this action.

*Alaska*, 457 BR 764 (Alaska, 2011); Trustee's Brief, p. 17, fn. 22. *Fur Gallery* states at p. 766:

> "'Property interests are created and defined by state law [US Supreme Court citations omitted].' The issues raised here involve interpretation of a security agreement executed between the parties and the scope of a claimed security interest. The Alaska Uniform Commercial Code and applicable state law regarding contract interpretation will govern their resolution."

Alaska interprets contracts as a question of law. *Monzingo v. Alaska Air Group*, 112 P.3d 655, 659 (Alaska 2005) [citing *K&K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 711-12 (Alaska 2003)]. When the language of a contract is unambiguous, the court "determines the parties' intent from the document itself." *Ellingstad v. State*, 979 P.2d 1000, 1004 (Alaska 1999) "[W]hile extrinsic evidence should be consulted, 'after the transaction has been shown in all its length and breadth, **the words of an integrated agreement remain the most important evidence of intention**.'" *Still v. Cunningham*, 94 P.3d 1104, 1109 (Alaska 2004); emphasis added.

**b. Law Favoring FNBA's Analysis of 2009 Security Agreement.**

The *Fur Gallery* Court, at pp. 766-67, was presented with identical issues and contract language: did this same form of security agreement from a prior loan secure a later loan. There the collateral was business personal property (*id.*, at p. 765), here it is a deposit account. Analyzing Alaska law, the *Fur Gallery* Court looked to three elements: i) the **contract language** of the cross collateral clause (quoted and analyzed below from FNBA's 2009 Security Agreement); ii) a provision of **Alaska's UCC**, A.S. § 45.29.204(c); and iii) the **Official Comment** to § 204(c) of Revised Article 9 of the UCC, and held that the security agreement <u>did</u> secure the later loan. Here we do the same analysis.

<u>**First**</u>, the language of the 2009 Security Agreement, quoted and discussed below, dictates

a continuing lien securing amounts owed by Omni at the time of the loan or arising thereafter, **even if**, according to the language of the contract, Omni was not indebted to FNBA for a period of time. The language actually says that; and unlike the Trustee, FNBA is not asking the Court to infer anything, just to read and enforce the language.

**Second**, AS § 45.29.204(c) provides, in relevant part:

> A security agreement may provide that collateral secures ... future advances or other value, whether or not the advances or value are given pursuant to a commitment.

Again, the language of the 2009 Security Agreement actually says that; and unlike the Trustee, FNBA is not asking the Court to infer anything, just to read and enforce the language.

**Third**, the *Fur Gallery* Court noted: "The Alaska Supreme Court has often found the Official Comments persuasive when determining issues under the Alaska Uniform Commercial Code" [*Id.*, at p. 773 (citations in footnote omitted)], and the *Fur Gallery* Court quoted *Official Comment 5* to UCC § 9-204:

> **Future Advances; Obligations Secured**. ... [C]ollateral may secure future as well as past or present advances if the security agreement so provides. ... Indeed, **the parties are free to agree that a security interest secures any obligation whatsoever**. **Determining the obligations secured by collateral is solely a matter of construing the parties' agreement under applicable law**. This Article rejects the holdings of cases decided under former Article 9 that applied other tests, such as whether a future advance or other subsequently incurred obligation was of the same or similar type or class as earlier advances and obligations secured by the collateral.

*Supra*, at p. 768 (emphasis added). The Court then held that the language of the security agreement was unambiguous and that the lien against personal property collateral created by the

earlier security agreement also secured the later loan. *Id.*, at pp. 774-775.[9]

With *Fur Gallery*, FNBA has a well and thoroughly reasoned case directly on point; the Trustee has no law to support her position.

Another Alaska case persuades that a continuing obligation will be enforced according to the language of the contract. In *Still v. Cunningham*, *supra*, the Alaska Supreme Court determined that a guaranty executed and delivered in connection with a prior loan was unambiguous and, by its unambiguous language, was a "continuing guaranty" so that it applied to a later loan. *Supra*, 94 P3d, at pp. 1109-1110. The court stated, "'the words of an integrated agreement remain the most important evidence of intention'", and it refused to allow parol evidence by the guarantor to contradict the unambiguous language of the guaranty that stated it was continuing in nature and applied to future loans. These cases compel one outcome; the language of the 2009 Security Agreement is unambiguous and it secured the 2013 loan.

## IV. Arguments Against Summary Judgment in Favor of Trustee.

### a. The *Duckworth* Case is a Contract Interpretation Case.

The Trustee's Brief focuses almost exclusively on the language of the 2013 Security Agreement and tries to prevent this Court from looking at the 2009 Security Agreement because the Trustee knows she cannot allow the 2009 Security Agreement to stand or she will lose this case. The Trustee therefore argues that we cannot look at the 2009 Agreement because the

---

[9] The *Fur Gallery* Court correctly distinguished cases decided before revised Article 9 was adopted throughout the country in 2001 and also distinguished the lead Alaska case on enforceability of dragnet clauses in the real property context because the former cases ignore the significant changes wrought by revised Article 9 and the latter case, by its language and reasoning, deals exclusively with real property not UCC collateral. *Supra*, at pp. 768 – 774.

"integration clause" of the 2013 Security Agreement prevents us from doing so, and she cites to *In re: Duckworth* 2013 WL 211231 (Bankr. C. D. Ill. 2013). But *Duckworth* does not do what the Trustee wants it to do; *Duckworth* is not an integrated contract case, it is a contract interpretation case. The *Duckworth* Court did not rely on "integrated contract" principles to reach its primary decision,[10] it simply interpreted the language of an "Indebtedness Clause".

In *Duckworth* a lender tried to stretch a security agreement that, unlike the security agreement here in Omni, did **not** contain a dragnet clause to encompass a subsequent loan. *Id.*, at p. 4. The *Duckworth* Court agreed with the bankruptcy trustee there that the security agreement did not contain a dragnet clause, despite the lender's argument to the contrary. *Id.*, at p. 4.

The "Indebtedness Clause" in *Duckworth* was limited; it read:

> The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

*Id.*, at p. 2; emphasis added. The *Duckworth* Indebtedness Clause stopped at this point, unlike the clause here in Omni. The *Duckworth* Court refused to stretch this language to mean "all promissory notes" whether "now or hereafter existing," as the lender had argued. *Id.*, at p. 4. The Court relied on its own prior case in which it had ruled "those [last two phrases, underlined above] operate to limit the covered indebtedness to the December, 2008 loan and none other." *Id.*, at p. 4. And it was those two phrases that made the Indebtedness Clause "circular", per the

[10] The *Duckworth* Court used the word "integration" only once in the text of the case, when it quoted one sentence of an integration clause from the contract at issue there, and the Court never discussed integrated contract principles after quoting the clause except for a brief comment in Footnote 3 at p. 3.

prior quoted decision, not the Indebtedness Clause as it reads here in Omni. *Id*, at p. 4. The *Duckworth* Court stated: "The [security agreements] do not contain a customary future advances or dragnet provision". The Court added, "Lacking a broad dragnet provision, each [security agreement] secured only the single debt specifically identified therein." *Id*., at p. 4.

Here in Omni, the Indebtedness clause of the 2009 Security Agreement does **not** stop where the Indebtedness Clause did in *Duckworth*. *See*, 2009 Security Agreement, Ex. A to Trustee's Brief, p. 4. And it must be emphasized that the Trustee is simply **wrong** when she states in her Brief, at p. 13, that the "Indebtedness Clause" here in Omni is "**exactly the same**" as the Indebtedness clause in *Duckworth*. This egregious error misstates a critical point because the language of the Indebtedness Clause here in Omni that the Trustee ignores with this statement is so important to the outcome of this Omni case.

**b. Language of Indebtedness Clause in FNBA Security Agreements.**

Here, instead of stopping after the first sentence, the Omni Indebtedness Clause goes on to add:

> "Specifically, without limitation, Indebtedness includes the future advances set forth in the **Future Advances provision**, together with all interest thereon and all amounts that may be indirectly secured by the **Cross-Collateralization provision** of this Agreement."

*See*, 2009 Security Agreement, Ex. A to Trustee's Brief, p. 4. Looking at the Future Advances and Cross Collateralization provisions from the 2009 Security Agreement (specifically incorporated into this Indebtedness Clause), they add exactly what was missing from the *Duckworth* contract, a "broad dragnet clause":

> FUTURE ADVANCES. In addition to the Note, this Agreement secures **all future advances made by Lender to Grantor regardless of whether the advances are made** a) **pursuant to a commitment** or b)

> for the same purposes.

and

> CROSS-COLLATERALIZATION. In addition to the Note, this Agreement secures **all obligations, debts and liabilities** ... **of Grantor to Lender**, ... **whether now existing or hereafter arising**, whether related or unrelated to the purpose of the Note ....

2009 Security Agreement, p. 1, Ex. A to Trustee's Brief; emphasis added.[11] The emphasized language is exactly what the *Duckworth* Court said was missing from the *Duckworth* security agreement, "all obligations now existing or hereafter arising". And the *Duckworth* court would have enforced the "broad dragnet provision" had there been one.

Of even greater significance on the point of what debt the 2009 Security Agreement covers, is the following **representation and warranty** made by Omni in the 2009 Security Agreement:

> This is a **continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full** and **even though for a period of time Grantor may not be indebted to Lender**.

2009 Security Agreement, p. 1, Ex. A to Trustee's Brief; emphasis added.

It is these latter provisions, **<u>not</u>** present in *Duckworth*,[12] that control the decision here. In

---

[11] The *Fur Gallery* court also noted that, **as here in Omni**, the contract language was agreed between "two sophisticated parties in a commercial context", the relevant provision of the security agreement was "not buried in the fine print. It appears on the first page of the agreement, and the header 'cross-collateralization' is both capitalized and bolded." *Id.*, at 774.

[12] It must be emphasized again that the Trustee is simply **wrong** when she states in brief, at p. 13, that the Indebtedness clause here in Omni is "**exactly the same**" as the Indebtedness clause in *Duckworth*. This egregious error misstates a critical point because the language the Trustee ignores with this statement is so important to the outcome of this Omni case.

fact, the *Duckworth* Court emphasized that, "Dragnet clauses have consistently been held to be valid and enforceable as a matter of Illinois law, as long as they are clear and unambiguous." *Id.*, p. 3. That is the dominant principle to take from *Duckworth*.

It should also be noted that the language of the Future Advances clause here in Omni talks about future advances "regardless of whether ... made pursuant to a commitment". 2009 Security Agreement, p. 1, Ex. A to Trustee's Brief. This contract language completely undermines the Trustee's argument that this document is meant only for circumstances when there is a commitment to make a loan. Trustee's Brief, p. 17. The contract here and the UCC say the same. UCC §9-204(3) says what the contract here says, future advance clauses are enforceable "whether or not the advances or value are given pursuant to a commitment". The Trustee struggles mightily, if futilely, to avoid the language of the 2009 Security Agreement.

**c. To Decide the "Indebtedness" Was Paid in Full Ignores the Contract Language.**

The Trustee makes a simple argument that FNBA's 2009 loan was paid off so the security for this loan could not have remained extant until FNBA made its 2013 loan. But to sustain this argument, the Court must once again --- as the Trustee seems to repeatedly ask this Court to do --- ignore the very language of the 2009 Security Agreement that it was a "continuing Security Agreement" that would remain in effect even if Omni was not indebted to FNBA for a time. 2009 Security Agreement, p. 1, Ex. A to Trustee's Brief. And this argument also ignores the broad language of *Official Comment 5* to UCC § 9-204 that a security agreement can secure future advances (regardless of their character) and can secure anything else the parties may agree.

**d. Proper Standard for Analysis of Dragnet Clause.**

The Trustee continues to pursue a quixotic quest for the "true intent" of the parties, failing to recognize that the "true intent" lies before her eyes in the very language of the contract itself and she also fails to acknowledge that the "true intent" test was rejected and abrogated upon adoption of Revised Article 9. *Official Comment 5* to UCC § 9-204 states in relevant part, "This Article rejects the holdings of cases decided under former Article 9 that applied other tests....". *Fur Gallery*, *supra*, cites numerous cases using the "other tests" that have been rejected. *Id.*, at pp. 771-72, fn. 54. One of those tests was the one looking for the "true intent of the parties"; it should have no further applicability to the issues presented here because *Fur Gallery* and cases cited therein have relegated the "true intent" test to the consumer loan context, if it has any continuing viability at all. *Fur Gallery*, *id.*, pp. 769, 770, 775.

**e. Integrated Contract Clause in 2013 Security Agreement Does Not Block Application of 2009 Security Agreement.**

So, should this Court ignore the 2009 Security Agreement, as the Trustee asks, because of the integrated contract clause of the 2013 Security Agreement? Absolutely not!

The language of the Integrated Contract clause of the 2013 Security Agreement reads in its entirety:

> "Amendments. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in **this** Agreement. No alteration or amendment to **this** Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment."

Ex. F to Trustee's Brief, p. 3 (emphasis added). This clause from the 2013 Security Agreement should not prevent reliance on the 2009 Security Agreement for two reasons: (1) the 2009

Security Agreement is a separate continuing agreement that stands on its own two feet, not dependent on anything else for its own ongoing validity, and (2) there is nothing inconsistent between the 2009 Security Agreement and the 2013 Security Agreement.

As to the first reason for giving effect to the 2009 Security Agreement, to adopt the Trustee's reasoning about the 2009 Security Agreement this Court must decide that there cannot be two loans and two security agreements between parties, each standing alone, each enforceable by their terms. But why can't two separate agreements each have independent continuing validity? The earlier agreement says it is continuing in nature, even when/if the earlier loan is paid in full, and it specifically says it secures future loans. The UCC establishes that this is permitted under revised Article 9. UCC § 9-204 and *Official Comment* 5 say that future advance clauses will be enforced. So do *Fur Gallery* and *Duckworth*.

The earlier loan is paid in full, as anticipated by the parties, but the language says the lien will remain in place to secure future loans. Why can't the language of the earlier loan continue to be effective by its terms, by the very language of the agreement itself? Why would this Court ignore the language of this contract when the UCC says a contract can do exactly what this one says? It is a stand-alone contract separate and apart from the 2013 loan. And the 2013 Security Agreement does not say prior agreements are cancelled or terminated. Here, FNBA enforced the 2009 Security Agreement pursuant to its own independent terms, exactly as anticipated by the contract itself and by the UCC.

The Court should take note that the *Fur Gallery* case presented the exact same issue as here, yet the Court did not refuse to enforce the language of the contract as the Trustee asks. The Trustee asserts in Brief in this Omni case, at p. 18, "The *Alaska Fur Gallery* [sic] did not involve

an integration clause in the 'new' loan." This is another egregious error stated by the Trustee in her Brief on an important issue; and this too is simply wrong. Undersigned counsel did a PACER search of the *Fur Gallery* Adversary Proceeding (Adversary Case 10-90001 DMD) that led to the *Fur Gallery* decision discussed in both parties' Briefs here and pulled the security documents from the "later loan" in *Fur Gallery* attached to the Trustee's Complaint (Docket #1), specifically several Deeds of Trust, all containing identical language.[13] One of the Deeds of Trust, dated in 2005, is attached to this Brief as Ex. B. This Court should take note that the 2005 Deed of Trust securing the "later loan" in *Fur Gallery* had the **exact same** Integrated Contract clause as appears here in the 2013 Security Agreement. *See*, 2005 Deed of Trust from *Fur Gallery*, p. 11, relevant language highlighted. Yet the *Fur Gallery* Court had no difficulty giving effect to the future advances and cross collateral provisions from the earlier loan as continuing to secure the later loan, despite the same Integrated Contract Clause in the later loan document. *Supra*, at pp. 766 – 768, 774 -775. And the Integrated Contract Clause did not prevent enforcement of the earlier loan provisions.

The fact is, the 2009 Security Agreement was also a fully integrated agreement that provided: "No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment." *See*, 2009 Security Agreement at p. 4, Ex. A to Trustee's Brief. Nothing in the 2013 Security Agreement purports to cancel or amend the 2009 Security Agreement, and in fact

---

[13] All of the Deeds of Trust securing the "later loans" in the *Fur Gallery* case contain the exact same Integrated Contract clause. The "later loans" were dated in 2003 and 2004 and the earlier security agreement at issue was dated in 2002. *Id*, at pp. 766 – 768.

the 2013 Agreement (Ex. F to Trustee's Brief) is entirely silent on the subject of altering or cancelling FNBA's continuing security interest in Omni's deposit accounts or the impact of 2009 Security Agreement's cross-collateralization and future advance clauses.

An instructive case is *Universal Guaranty Life Ins. Co. v. Coughlin*, 481 F.3d 458 (7th Cir. 2007), which, like here, involved two loans and two different security agreements. The first loan was in 2002 and was secured by a company's accounts receivable. The security agreement contained a dragnet clause securing all the company's obligations, including future obligations. In 2003 the company obtained a second loan collateralized by cash pledged by one of the company's principals. The issue in the case was whether the bank could enforce its 2002 security interest in accounts receivable to secure the 2003 loan. The Seventh Circuit upheld the dragnet clause in the 2002 security agreement and rejected an argument that the 2003 loan was secured only by the principal's cash, stating:

> In this case, the March 7 [2003] loan agreement said that the loan was secured by Coughlin's $250,000, but made no mention of a security interest in Health Management's accounts receivable. It also contained no language terminating or modifying the April 30, 2002 security agreement. As a result, there was no contradiction or inconsistency between the various loan and security documents, and the plain and unambiguous language of the dragnet clause controlled.

*Id.* at p. 464.

The Court also noted that the dragnet clause in the first security agreement "could not be modified 'orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the Borrower to be charged.' **This means that absent an express modification, Marine Bank's other loans with Health Management could have no bearing**

**on the meaning or effect of the April 30, 2002 dragnet clause.**" *Id.*, at pp. 464-465 (emphasis added). As in the Seventh Circuit case, there is nothing in FNBA's 2013 Security Agreement (Ex. F to Trustee's Brief) that expressly eliminated FNBA's 2009 security interest in Omni's deposit accounts or that purported to eliminate the 2009 Security Agreement's dragnet clause. Ex. A to Trustee's Brief, p. 1. Therefore, both the 2009 Security Agreement dragnet clause and FNBA's security interest in deposit accounts remained extant and should be enforced. The principle is really quite simple: the 2009 Security Agreement identified collateral that secured the 2009 loan and all other indebtedness including future indebtedness; and the 2013 Security Agreement identified collateral that secured the 2013 loan and all other indebtedness. That is what dragnet clauses do, and both agreements are independently enforceable and complementary of each other.

**f. Judicial Recognition of Legitimacy of Using Form Documents to Protect Banks.**

Lest there be any doubt, consider the simple and self-evident logic employed by banks in using form loan documents, as the courts did in *Fur Gallery* and *Duckworth*. These documents are form documents designed and intended to protect the bank even from its own loan officers who are working in the stressful environment of a demanding borrower who wants nothing more than to close a loan and get the loan proceeds in a hurry. In the face of an argument by the bankruptcy trustee in *Fur Gallery* that the lender knew how to document a lien when it wanted to so it should have taken the collateral in the later security agreement (as also argued here by the Trustee), the *Fur Gallery* Court says on this subject:

> "[The lender's] failure to have [borrower] enter security agreements when it extended the two [later] loans could also be viewed as an oversight by [the lender] or an assumption on the lender's part that its earlier agreement would provide it with this protection.[73] This

> view is particularly persuasive in light of the fact that [the lender] had recorded a UCC–1 as early as 1993, evidencing a security interest in all of [borrower's] goods, including equipment, inventory, accounts and chattel paper.

The footnote from this *Fur Gallery* quote cites to a 7th Circuit case, *Matter of Kazmierczak*, 24 F.3d 1020, 1021 - 22 (7th Cir.1994), for the proposition that including a dragnet clause in the earlier loan documents acts as a "hedge" against the parties' failure to execute a new security agreement each year in connection with new crop financing.

And the *Duckworth* Court similarly says on the subject of banks using form documents,

> "So the TRUSTEE'S contention that a reasonable subsequent lender who couldn't "find" [this lender's] note [bearing the clerically mistaken date], could make no further inquiry and be justified in concluding that the [security agreement] secured no debt, ignores the plain terms of the [security agreement], defies common sense, and **is contrary to the universal concern of banks and their regulators that lending practices promote a bank's safety and soundness**."

And the *Kazmierczak*, case, *supra*, is most instructive on the point of acknowledging the realities of banking practices even though decided in 1994 before the 2001 revisions to Article 9:

> "Expressly authorized by section 9-204(3) of the Uniform Commercial Code, Wis.Stat. § 409.204(3), **a future-advances lien saves the parties the trouble of executing a new security agreement every time there is a further extension of credit. It also backstops the lender against the possibility of an inadvertent failure by the borrower to execute the new agreement, as apparently happened here**. The original agreement must make clear its applicability to future debts, but the 1991 agreement signed by the debtors in this case could not have been clearer. The fact emphasized by the bankruptcy judge, that the parties had intended to execute a fresh security agreement every year, has no weight at all. **The 'future debts' clause was a hedge against their failing to do so. They could of course have canceled it by mutual consent**."

*Id*, at p. 1021.

And *Pride Hyundai, Inc. v. Chrysler Fin. Co., L.L.C.*, 369 F.3d 603, 614-15 (1st Cir.2004), decided **after** Revised Article 9 was adopted and interpreting revised §9-204, is most instructive on these points. It states:

> The parties in transactions involving dragnet clauses are typically sophisticated market actors. Commercial parties on both sides of a transaction may have good reasons to enter into a security agreement that secures not only present liabilities, but also future liabilities of a different class or type. Such an arrangement allows future credit to be extended between the parties on a secured basis without the additional transaction costs that would accompany the execution of a new agreement for each such transaction. *See* 2 Clark, *The Law of Secured Transactions under the Uniform Commercial Code* § 10.01[3] (2000) ("Article 9 makes it clear that [future] advances become part of the obligation secured by the collateral without the necessity of new security agreements accompanying the future advances.").
>
> Additionally, **the approach set forth in the Official Commentary provides the benefit of greater certainty to sophisticated commercial actors about the circumstances in which dragnet clauses will be enforced. One of the primary shortcomings of comparing types of debt is that the inquiry is inherently uncertain.** *See* Campbell, *supra,* at 1040. Commercial parties place considerable value on having a clear set of legal background rules against which to order their affairs. *See* Robert E. Scott, *A Relational Theory of Default Rules for Commercial Contracts*, 19 J. Legal Stud. 597, 598 (1990). And the Code itself says that it should be construed according to its underlying purposes and policies, one of which is "to simplify, clarify and modernize the law governing commercial transactions." Mass. Gen. Laws ch. 106, § 1–102.

What we see with these comments from *Fur Gallery*, *Duckworth*, *Kazmierczak*, and *Pride Hyundai* is a judicial recognition and appreciation that banks are deserving of protection in their dealings with their commercial customers. Banks put into place protections that help the bank protect itself from human error, human complacency, and mistakes in the face of the time pressures of the business world. These protections, like future advance and cross-collateralization clauses, are specifically permitted by the UCC, undoubtedly in recognition of the reality of banking practices. And, so long as the language of the loan contract is clear and unambiguous, these built-in protections are enforceable. They should not be criticized, as the Trustee does here, they should be respected and enforced.

**g. Legitimacy of Continuing Lien Against Omni Deposit Account.**

The Trustee hypothesizes a scenario about lenders not bothering to document a lien once

a loan and its collateral documents have been put in place and she exaggerates the hypothetical to the extreme: "Omni could come back to the bank decades (or even centuries) later and ... no new security agreement would ever be required ...." Trustee's Brief, p. 21. The answer is unequivocally and unqualifiedly **yes** that could happen and the lien would remain valid and perfected. But the point should not be lost with the Trustee's bizarre, extreme hypothetical. As the *Kazmierczak* Court noted, "they (the parties) could have cancelled [the lien] by mutual consent"; Omni could have requested termination of the lien on its deposit account at a time when no funds were owed on any loans; or Omni could have closed the deposit account. All three events would have terminated the lien at issue here. But none of those events ever happened. And Omni may even have had in mind a new loan from FNBA in the future under the ongoing relationship it had with the Bank when it paid off the 2009 loan. The lien continued because the 2009 Security Agreement said it did and FNBA retained control over the deposit account and, therefore, perfection.

What is so very wrong with this reality; why can't banks enjoy the protections written into the UCC and contained in their own form loan documents? Because this Trustee does not like this rule of law? It is certainly not because this Trustee cites us to a case that says these things cannot or should not happen. And guess what, as things turned out Omni **did** come back for a new loan from FNBA, in 2013, so the event was not so hypothetical here.

And *Fur Gallery* takes this one step further, noting that there is no equitable reason not to do what these contract clauses say, because, as here in Omni, the contract language was agreed between "two sophisticated parties in a commercial context", the relevant provision of the security agreement was "not buried in the fine print. It appears on the first page of the

agreement, and the header 'cross-collateralization' is both capitalized and bolded." *Id*, at 774. All of this is true here in Omni too. Omni should have gone into this series of loans with its long-time lender (with loans in 2005, 2009, and 2013), and specifically into the 2009 loan, recognizing the import of the documents it signed; it granted a lien against its deposit account with FNBA and it continued to maintain its deposit account with FNBA all the way through the series of loans between the parties starting in 2005, continuing in 2009, and concluding in 2013.

Why should the Court deny effectiveness of the plain meaning of the language of the contracts? Why should the Court not do what the contracts say? Why should the Court ignore the reality of the national banking community as embodied in the UCC? The Trustee gives no good reason to do so. The Court should **not** do so.

## V. Conclusion.

This Court should recognize the continuing validity of the 2009 Security Agreement creating the lien against Omni's deposit account in favor of FNBA and securing all Omni's indebtedness, including the 2013 loan. It should deny the Trustee's Motion for Summary Judgment, finding that FNBA's resort to the funds in Omni's deposit account was a legitimate exercise of its rights under the UCC. The Court should grant summary judgment in favor of FNBA dismissing the Trustee's Complaint with prejudice.[14]

---

[14] If the Court rules in favor of FNBA, it will seek its reasonable actual attorneys' fees and costs for defending its lien under State law as allowed by its loan documents and by State law, but it will do so by appropriate motion under BR 7054 at the appropriate time.

RESPECTFULLY SUBMITTED this __15th__ day of April 2016.

GROH EGGERS, LLC

Attorneys for Defendant First National Bank Alaska

_______/s/ Dennis G. Fenerty_______
Dennis G. Fenerty

List of Exhibits:

Exhibit A – Wire Transfer Receipt
Exhibit B – 2005 Security Agreement from Alaska Fur Gallery Adversary Case

**CERTIFICATE OF SERVICE**:

The undersigned hereby certifies that the foregoing was served via the ECF system on the following person on April 15, 2016:

Cabot Christianson – cabot@cclawyers.net
LAW OFFICES OF CABOT CHRISTIANSON, P. C.
Attorney for Plaintiff Nacole M. Jipping, Chapter 7 Trustee

_______/s/ Dennis G. Fenerty_______
Dennis G. Fenerty