JUDGE HERB ROSS (Recalled)

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF ALASKA

605 West 4th Avenue, Room 138, Anchorage, AK 99501-2253 —   (Website: www.akb.uscourts.gov)
Clerk's Office:  907-271-2655 (1-800-859-8059 In-State) — Judge's Fax:  907-271-2692

| Case No. A15-00076-HAR | In Chapter 7 |
|---|---|
| In re OMNI ENTERPRISES, INC., <br> Debtor | |
| NACOLE M. JIPPING, <br> Plaintiff <br> v. <br> FIRST NATIONAL BANK ALASKA, <br> Defendant | Adv Proc No A15-90018-HAR <br><br> MEMORANDUM DECISION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT |

Contents                                                                 Page

1. **SUMMARY OF DECISION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2. **FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   2.1. **The Essential Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   2.2. **A Little More Historical Context** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   2.3. **The 2009 Loan** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   2.4. **The 2013 Loan** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   2.5. **The Important Contractual Clauses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.5.1. **Terms from the 2009 Security Agreement** . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.5.2. **Terms from the 2013 Security Agreement** . . . . . . . . . . . . . . . . . . . . . . . . 8

3. **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   3.1. **Summary Judgment Standards** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   3.2. **Summary of Arguments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   3.3. *Alaska Fur Gallery* **is Not Dispositive** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   3.4. **Deposit Accounts Under the UCC** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   3.5. **The Alaska Law Regarding Integrated Contracts** . . . . . . . . . . . . . . . . . . . . . . 13
   3.6. **The 2009 Security Agreement Was Not Terminated by the 2011 Payoff**- . . . . . . . . 17
   3.7. **Damages Under 11 USC § 553(b) Are Not Appropriate** . . . . . . . . . . . . . . . . . . 18

4. **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1. **SUMMARY OF DECISION**- In **2009** Omni borrowed $1.3 million from FNBA. Part of the collateral under the 2009 Security Agreement was "Deposit Accounts."[1] The 2009 Security Agreement also contained future advances and cross-collateralization clauses. Omni paid off the 2009 loan in **2011**.

In **2013**, Omni borrowed $2.6 million for equipment for a new grocery store in Bethel, Alaska. The collateral did not explicitly include "Deposit Accounts." The 2013 Security Agreement contained an integration clause saying the 2013 loan documents were the "entire agreement" between FNBA and Omni, and did not explicitly mention the 2009 Security Agreement.

When Omni got into financial trouble in **2015**, FNBA swept Omni's FNBA checking account, seizing $1.3 million. FNBA claims it had lien rights in the checking account stemming from its lien rights on "Deposit Accounts" in the 2009 Security Agreement.

Omni filed a chapter 7 bankruptcy. The trustee filed this adversary proceeding. Cross-motions for summary judgment were filed. The trustee argues that the integration clause in the **2013 Security Agreement** trumps FNBA's future advances claim of lien arising from the **2009 Security Agreement**. The trustee's second point is that the 2009 Security Agreement, by virtue of a Survival clause, terminated when was paid off in 2011. FNBA disputes these conclusions.

I hold for FNBA that while the 2013 Security Agreement integration clause provides that it was the "entire agreement" involving the 2013 loan, the definitions of "Related Documents" and "Indebtedness," though somewhat circular, are sufficiently clear for the court to find the 2009 Security Agreement is implicitly part of the "entire agreement."

Additionally, the Survival clause in the 2009 Security Agreement does not direct that the security interest in Deposit Accounts expired when the 2009 loan was paid because the 2009

---

[1] AS 45.29.102(a)(36) states in Article 9 of the Alaska Uniform Commercial Code that " 'deposit account' means a demand, time, savings, passbook, or similar account maintained with a bank except that the term does not include investment property or accounts evidenced by an instrument" . . .

MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT                                                        Page 2 of 19

Security Agreement has a future advances clause that is inconsistent with termination even though the 2009 Security Agreement secured no existing debt from time to time.

Since the FNBA sweep was supported by its deposit account lien rights, the trustee cannot avoid it under 11 USC §547(b).

## 2. FACTUAL BACKGROUND-

**2.1. The Essential Facts**- The facts are uncontested. A fuller discussion of them is set out in the parties' summary judgment briefs. These briefs include a number of exhibits (including commercial security agreements, financing statements, extension agreements, etc.) and give more context to the story.[2]

To focus on the essential facts and exhibits used in deciding this dispute, however, the court will concentrate on the two commercial security agreements between Omni and FNBA, one in 2009 and the other in 2013. These will be the two exhibits attached to the memorandum decision. These exhibits, with the highlighting, are copied from the trustee's opening summary judgment brief at ECF No. 12. Exhibit A is a copy of the 2009 Security Agreement. Exhibit F is a copy of the 2013 Security Agreement.

Both documents have been described to me as being a product of the Laser Pro document system. These forms, or at least some of the key terms, were also used in some of the cases cited by the parties.[3] The parties did not describe the construct of the forms in detail - for example, what is fixed "boilerplate" and what is customizable to suit the situation.

---

[2] *Trustee's Motion for Summary Judgment.* ECF No. 12, pages 5-8, including fourteen exhibits; *FNBA's Brief in Opposition to Trustee's Motion for Summary Judgment* and *FNBA's Motion for Summary Judgment and Brief in Support.* ECF 13, pages 2-5.

[3] See the trustee's opening brief, ECF No. 12, page 12 and the trustee's reply, ECF 14, page 11, fn9.

MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT                                                          Page 3 of 19

Some of the facts discussed by the trustee[4] relate to the setoff recovery argument the trustee makes. That is, if FNBA did not have a lien in Deposit Accounts then its setoff rights are restricted by 11 USC § 553(b) and it must return $1,256,504.49 to the trustee. The parties agree that if FNBA had a lien on Deposit Accounts for the 2013 loan by virtue of the future advances clause for the 2009 loan FNBA wins and keeps the money it swept from Omni's bank account. If it does not have such a lien, the trustee prevails under §§ 547(b) and 553(b). So, I will not review the setoff argument in detail.

**2.2. A Little More Historical Context**- Omni maintained a bank account at FNBA from at least 2005 to the petition date in 2015. This dispute involves two commercial loans FNBA made to Omni, one in 2009 and the second in 2013.

These loans involved commercial security agreements, financing statements, promissory notes, modification of the 2013 loan payment terms, etc. None of these effect the outcome except the two security agreements.

In 2015, when only the 2013 loan was outstanding, FNBA learned Omni might be going out of business. So, it swept the balances from Omni's checking account between March 11, 2015 and March 17, 2015 to the tune of $1,329,096.51. While both parties acknowledge that FNBA has setoff rights under the terms of the 2013 Security Agreement, FNBA also claims it has lien rights pursuant to the future advances clause of the 2009 Security Agreement, notwithstanding the fact that the 2009 loan had been paid off. These liens rights, if they exist, would protect FNBA from a preference avoidance under 11 USC §547(b).

The trustee counters that the integration clause in the 2013 Security Agreement does not mention Deposit Accounts or the 2009 Security Agreement as being part of the collateral and

---

[4]The trustee's opening summary judgment brief. ECF No. 12, pages 22-24 and related exhibits.

MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT                                                    Page 4 of 19

2013 loan agreement, and to the contrary it says that the 2013 loan is only based on the documents specifically identified in the 2013 Security Agreement. At oral argument FNBA conceded that there is no specific mention of the 2009 Security Agreement in the papers involved in the 2013 loan. But it argues that the policy of the Uniform Commercial Code is to favor future advance clauses, as recognized in several Alaska bankruptcy court decisions, which establish that this court should treat Deposit Accounts as collateral for the 2013 loan.

As previously indicated, both parties acknowledge the setoff rights of FNBA, but do not contest that if FNBA does not have lien rights, the trustee is entitled to recover $1,256,504.49 pursuant to 11 USC §553(b). If it does have lien rights, however, the foreclosure or sweep of the deposit account in 2015 was not a preference under 11 USC §547(b).

**2.3. The 2009 Loan**- The 2009 loan was for $1,277,883.21 on about September 2, 2009. Part of the collateral was "Deposit Accounts." This loan was paid off in full in 2011.

The 2009 Security Agreement contained a "Future Advances" clause as well as a "Survival" or termination clause and other terms reproduced verbatim in Section 2.5.1 of this memorandum.

**2.4. The 2013 Loan**- Omni decided to open a grocery and retail store in Bethel, Alaska.[5] To finance an extensive list of equipment, furnishing and fixtures, it borrowed $2,575,520 on about August 13, 2013. These items and others were listed as the collateral, but Deposit Accounts were not specifically mentioned.

The 2013 Security Agreement has an integration clause, called the Amendment clause, identifying all the papers and agreements that were the basis of the 2013 loan, with no explicit

---

[5]"Bethel (Mamterilleq in Central Alaskan Yup'ik) is a city located near the west coast of the U.S. state of Alaska, approximately 400 miles (640 km) west of Anchorage. Accessible only by air and river, Bethel is the main port on the Kuskokwim River and is an administrative and transportation hub for the 56 villages in the Yukon-Kuskokwim Delta." Wikipedia for "Bethel, Alaska" as it appeared on 05/22/16 at https://en.wikipedia.org/wiki/Bethel, Alaska.

MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT                                                      Page 5 of 19

mention of the 2009 Security Agreement and its future advances clause or Deposit Accounts collateral.

The pertinent contract provisions are reproduced verbatim in Section 2.5.2 of this memorandum.

**2.5. The Important Contractual Clauses**- The parties have identified the 2009 and 2013 Security Agreements as the keystones in determining whether the trustee or FNBA prevails. The trustee has selected the key contract terms to focus upon: "Agreement"; "Future Advances"; "Cross-collateralization"; "Survival of Representations and Warranties; Perfection of Security Interests"; "Amendments" (the integration clause); "Related Documents"; "Right of Setoff; and, Indebtedness."[6] Though the wording of these terms is identical in both agreements I will repeat them for each agreement for ease of use and clarity.

**2.5.1. Terms from the 2009 Security Agreement**- FNBA principally relies on the **Future Advances** and **Cross-collateralization** clauses in the 2009 Security Agreement to establish that Deposit Accounts are collateral for the 2013 loan. Again, if FNBA has a "lien" on the accounts it swept then the trustee cannot avoid the $1.3 million it foreclosed on when it swept funds from Omni's deposit account. The 2009 Future Advances clause[7] and the Cross-Collateralization clause[8] provide:

> **FUTURE ADVANCES**. In addition to the Note, this Agreement secures all future advances made by lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.
>
> **CROSS-COLLATERALIZATION**. In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or

---

[6]Trustee's motion for summary judgment. ECF No. 12, pages 9-16.

[7]Exhibit A, page 1.

[8]Exhibit A, page 1.

any one or more of them, as well as all claims by Lender against Grantor or anyone or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

The trustee counters that the 2009 Security Agreement was terminated when the 2009 loan was paid off in 2011 by virtue of the Survival of Representations and Warranties clause[9]:

> **Survival of Representations and Warranties**. All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

FNBA argues to the contrary that the 2009 Security Agreement with Deposit Accounts as collateral was not terminated by the Survival clause because the "Indebtedness"[10] includes future advances (such as the 2013 loan):

> **Indebtedness**. The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

In addition, FNBA says the "Perfection of Security Interest"[11] clause belies the argument that the 2009 agreement was terminated by the 2011 payoff of the 2009 loan. This clause says

---

[9]Exhibit A, page 4.

[10]Exhibit A, page 4.

[11]Exhibit A, page 1.

MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT                                                                                      Page 7 of 19

despite any prior payoff (e.g., of the 2009 loan), the duty to assist where necessary in perfection of subsequent loans (e.g., the 2013 loan) continues for the Grantor (Omni):

> **GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL** With respect to the Collateral, Grantor represents and promises the Lender that:
> **Perfection of Security Interest**. Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender**.

The trustee argues that survival and perfection clauses, though seemingly inconsistent can be harmonized.[12] And, if the court finds them inconsistent, it should tag FNBA as drafter with the fault and adopt the trustee's position that the survival clause controls.

    **2.5.2. <u>Terms from the 2013 Security Agreement</u>**- The trustee focuses on various terms of the 2013 Security Agreement to support her argument that the Amendments clause (that is, the integration clause) excludes inclusion of the 2009 Future Advances clause (which includes Deposit Accounts as collateral).

The Amendments clause[13] reads:

> **Amendments**. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

---

[12]Trustee's reply brief. ECF No. 14, pages 9-14.

[13]Exhibit F, page 3 at the bottom under Miscellaneous Provisions.

MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT      Page 8 of 19

Fleshing out the other important terms to understanding the trustee's integrated contract argument are:

**Agreement**.[14] The word "Agreement" means this Commercial Security Agreement as this Commercial Security Agreement may be amended from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Related Documents**.[15] The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Indebtedness**.[16] The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**CROSS-COLLATERALIZATION**.[17] In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or anyone or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

---

[14]Exhibit F, page 4 under Definitions.

[15]Exhibit F, page 4 at the bottom under Definitions.

[16]Exhibit F, page 4 at the bottom under Definitions.

[17]Exhibit F, page 1.

MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT                                              Page 9 of 19

Finally, the trustee notes the Right of Setoff clause as a predicate to her argument that that right is prescribed by the restrictions on FNBA imposed by 11 USC §553(b):

> **Right of Setoff**.[18] To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

3. **LEGAL ANALYSIS**-

3.1. **Summary Judgment Standards**- Both sides agree that there are no material factual disputes and ask that the court enter a summary judgment in its favor pursuant to Rule 56(a) as a matter of law:[19]

> (a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

3.2. **Summary of Arguments**- The trustee has two main arguments: (a) the 2013 Security Agreement has an integration clause and the agreement makes no mention that the Future Advances clause of the 2009 Security Agreement (with its Deposit Accounts collateral) is part of the deal; and, (b) when the 2009 loan was paid off in 2011 the 2009 Security Agreement terminated by virtue of the Survival clause in the 2009 Security Agreement.

FNBA argues that the Uniform Commercial Code now favors the use of future advances clauses and the policy is that they should not be restricted by artificial tests seeking to establish

---

[18] Exhibit F, page 1.

[19] Rule 7056 of the Fed. R. Bankr.P. incorporates Rule 56 of the Fed. R. Civ. Proc.

the "true intent" of the parties. So, FNBA contends, that there is no reason the 2009 Future Advances clause cannot co-exist with the 2013 Security Agreement.[20]

**3.3. *Alaska Fur Gallery* is Not Dispositive**- FNBA says that the Omni case should be resolved by following Judge MacDonald's decision in Alaska Fur Gallery.[21] Judge MacDonald held that a future advances clause in a 2002 UCC security agreement in which business personal property was collateral was enforceable to cover subsequent loans (in 2003 and 2004) secured by real estate. That is, business personal property, by virtue of the 2002 future advances clause in the security agreement (the 2002 loan was paid off in 2004), also secured the 2003 and 2004 loans secured by real estate.

The lender relied on AS 45.29.204(c) (2011) that permits security agreements to "provide that collateral secures . . . future advances or other value, whether or not the advances or value are given pursuant to a commitment."[22] Alaska Fur Gallery urged the court to follow the Lundgren case[23] which took a more restrictive approach and sought to determine the "true intent" of the parties to the future advances clause rather than enforcing its literal interpretation.

---

[20] FNBA's opening summary judgment brief. ECF No. 13, page 13-14.

[21] In re Alaska Fur Gallery, Inc., 457 B.R. 764 (Bankr. D. Alaska 2011).

[22] *Id*, at 768.

[23] Lundgren v. National Bank of Alaska, 756 P.2d 270 (Alaska 1987).

MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT                                           Page 11 of 19

Noting that <u>Lundgren</u> was twenty-four years old and perhaps out of date,[24] the court instead adopted the more modern approach of present UCC Article 9. It cited this Official Comment.5 to UCC § 9-204:

> Future Advances; Obligations Secured. Under subsection (c) collateral may secure future as well as past or present advances if the security agreement so provides. This is in line with the policy of this Article toward security interests in after-acquired property under subsection (a). Indeed, the parties are free to agree that a security interest secures any obligation whatsoever. Determining the obligations secured by collateral is solely a matter of construing the parties' agreement under applicable law. This Article rejects the holdings of cases decided under former Article 9 that applied other tests, such as whether a future advance or other subsequently incurred obligation was of the same or a similar type or class as earlier advances and obligations secured by the collateral.

But, the court in <u>Alaska Fur Gallery</u> never addressed the integration clause issue now raised by the trustee. Where a new legal theory is offered, a case involving similar facts which was decided on other grounds is not precedential.[25]

**3.4. <u>Deposit Accounts Under the UCC</u>**- AS 45.29.102(a)(36) states in Article 9 of the Alaska Uniform Commercial Code that " 'deposit account' means a demand, time, savings, passbook, or similar account maintained with a bank except that the term does not include

---

[24] I disagree with the conclusion that the bankruptcy court can disregard the ruling in <u>Lundgren</u>. It is an Alaska Supreme Court opinion that has never been overruled and which the bankruptcy court is bound to follow. <u>In re Kekauoha-Alisa</u>, 674 F.3d 1083, 1087-88 (9th Cir. 2012). In a later case involving a consumer loan, Judge MacDonald provided what I consider to be a better reason – <u>Lundgren</u> applies only to real estate security (generally, deeds of trust in Alaska) and explicitly said it does not apply to the UCC. <u>In re Zaochney</u>, 2011 WL 6148727 (Bankr. D. Alaska 2011) ("However, the court [in <u>Lundgren</u>] also indicated that UCC policy considerations were not relevant to its determination of the impact of the dragnet clause in the deed of trust.")

[25] <u>Arizona Christian School Tuition Organization v. Winn</u>, 131 S.Ct. 1436, 1448-49 (2011); <u>District of Columbia v. Gould</u>, 852 A.2d 50, 56, fn6 (DC Ct. App. 2004); <u>Lundgren</u>, at 277, fn 9 ("<u>Alaska Statebank v. Kirschbaum,</u> 662 P.2d 939 (Alaska 1983), is not dispositive. There the borrowers did not dispute that the dragnet clause in each of two security agreements meant that the collateral securing that loan also secured the other loan. *See id.* at 940-41 & nn. 4, 6.").

investment property or accounts evidenced by an instrument." The Omni checking account which FNBA swept in 2015 was a Deposit Account.

Liens on Deposit Accounts are perfected by "control."[26] A UCC financing statement need not be filed to perfect a security interest in a Deposit Account. The parties agree that if FNBA had a security interest in the Deposit Account in 2015 by virtue on the 2009 dragnet clause, it also had "control" and the right to sweep (as opposed to setoff) the account to cover its 2013 loan.

**3.5. The Alaska Law Regarding Integrated Contracts**- The law of the state of Alaska governs the property rights of the trustee and FNBA. As in Alaska Fur Gallery[27]:

> " 'Property interests are created and defined by state law.' " The issues raised here involve interpretation of a security agreement executed between the parties and the scope of a claimed security interest. The Alaska Uniform Commercial Code and applicable state law regarding contract interpretation will govern their resolution. [footnote omitted]

The goal in this case involves contract interpretation and enforcement of the reasonable expectations of the parties. "The interpretation of words in a contract, where the extrinsic evidence is undisputed, is generally a task for the trial court . . ."[28]

---

[26]AS 45.29.304, **Law governing perfection and priority of security interests in deposit accounts** and AS 45.29.104()(1), **Control of Deposit Accounts** ("(a) A secured party has control of a deposit account if (1) the secured party is the bank with which the deposit account is maintained; . . .")

[27]In re Alaska Fur Gallery, 457 B.R. at 765, citing, Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co., 549 U.S. 443, 451, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007); quoting Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

[28]Municipality of Anchorage v. Gentile, 922 P.2d 248, 256 (Alaska 1996) [citations omitted]; Still v. Cunningham, 94 P.2d 1104, 1109-10 (Alaska 2004); Monzingo v. Alaska Air Group, 112 P.3d 655, 659 (Alaska 2005) [citing K&K Recycling, Inc. v. Alaska Gold Co., 80 P.3d 702, 711-12 (Alaska 2003)].

The 2013 Security Agreement has an integration clause:

> **Amendments**. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

If the court determines that the contract is integrated (a view which both parties espouse), the parol evidence rule is implicated as explained in the Lower Kuskokwim School District opinion[29]:

> The parol evidence rule is a rule of substantive law which holds that an integrated written contract may not be varied or contradicted by prior negotiations or agreements. Before the parol evidence rule can be applied, three preliminary determinations must be made: (1) whether the contract is integrated, (2) what the contract means, and (3) whether the prior agreement conflicts with the integrated agreement. Alaska Northern Dev., Inc. v. Alyeska Pipeline Serv. Co., 666 P.2d 33, 37–40 (Alaska 1983), *cert. denied*, 464 U.S. 1041, 104 S.Ct. 706, 79 L.Ed.2d 170 (1984). Extrinsic evidence may always be received on the question of meaning. Alyeska Pipeline Serv. Co. v. O'Kelley, 645 P.2d 767, 771 n. 1 (Alaska 1982). Once the meaning of the written contract is determined, however, the parol evidence rule precludes the enforcement of prior inconsistent agreements. Alaska Northern, 666 P.2d at 37.
>
> . . . .
>
> This is not to say that the parol evidence rule is easy to apply. There is an obvious tension between using extrinsic evidence of a prior agreement for the purpose of determining the meaning of an integrated contract, and barring the use of a prior agreement to change an integrated contract once its meaning is determined. The evidence which is consulted to determine meaning may be the same evidence which is later excluded, or rendered irrelevant, by the parol evidence rule. However, this apparent conflict is made manageable in most cases by various practical rules. For example, while extrinsic evidence should be consulted in determining the meaning of a written contract, nonetheless "after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention." *Restatement (Second) of Contracts* § 212 comment b. Further, questions of interpretation of the meaning of written documents are treated as questions of law for the court except where they are dependent for their resolution on conflicting extrinsic evidence. O'Kelley, 645

---

[29]Alaska Diversified Contractors, Inc. v. Lower Kuskokwim School Dist., 778 P.2d 581, 583–84 (Alaska 1989) (footnotes omitted).

P.2d at 771 n. 2; *Restatement (Second) of Contracts* § 212, comments d, e. The question of the meaning of a written contract, including a review of the extrinsic evidence to determine whether any of the extrinsic evidence is conflicting, is a preliminary question for the court. Where there is conflicting extrinsic evidence the court, rather than the jury, must nonetheless decide the question of meaning except where the written language, read in context, is reasonably susceptible to both asserted meanings. Alaska Northern, 666 P.2d at 39.

Under the plain wording on the 2013 Amendments clause, it and any related paperwork (such promissory notes, security agreements, etc. covered under the definition of Related Documents, **now** or hereafter existing) " constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement." Indeed, FNBA argues that the 2009 Security Agreement is an integrated agreement (without citing the Amendments clause),[30] and it is hard to see that it could claim the 2013 Security Agreement is not.

FNBA argues:[31]

> The earlier loan is paid in full, as anticipated by the parties, but the language says the lien will remain in place to secure future loans. Why can't the language of the earlier loan continue to be effective by its terms, by the very language of the agreement itself? Why would this Court ignore the language of this contract when the UCC says a contract can do exactly what this one says? It is a stand-alone contract separate and apart from the 2013 loan. And the 2013 Security Agreement does not say prior agreements are cancelled or terminated. Here, FNBA enforced the 2009 Security Agreement pursuant to its own independent terms, exactly as anticipated by the contract itself and by the UCC.

This begs the question. The court is not ignoring the 2009 Security Agreement, but rather deciding if it is one of the documents contemplated by the Amendment (integration) clause: "This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement." The 2009 Security

---

[30]FNBA's motion for summary judgment. ECF 13, page 8.

[31]FNBA's motion for summary judgment. ECF 13, page 14.

MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT                                                    Page 15 of 19

Agreement still exists. It was not terminated.[32] The question, however, is whether or not the 2009 Security Agreement was included it as part of their "entire agreement" with respect to the 2013 loan.

At oral argument, FNBA acknowledge the 2009 Security Agreement was not expressly mentioned in the 2013 Security Agreement.

The answer lies in the somewhat circular definitions of "Related Documents" and "Indebtedness" in the 2013 Security Agreement.[33] It becomes a chicken-and-egg question - does the integration clause exclude the 2009 Security Agreement or not?. Despite this circularity, the Related Documents definition in the 2013 Security Agreement is sufficiently clear to mean, in this case [emphasis and bracket matter added]:

> **Related Documents**. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, **security agreements [such as the 2009 Security Agreement]**, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether **now or hereafter existing [such as the 2009 Security Agreement]**, **executed [by virtue of the Future Advances clause in the 2009 Security Agreement] in connection with the Indebtedness [such as the 2013 loan]**.

I conclude that the Amendment clause in the 2013 Security Agreement is an integration clause. I further conclude that the 2009 Security Agreement with its Deposit Accounts collateral is one of the Related Documents covered by the Indebtedness described in the 2013 Security Agreement. The reference to the 2009 Security Agreement is not specific, and is in fact

---

[32] *See*, Section 3.7 of this memorandum.

[33] In State Bank of Toulon v. Covey (In re Duckworth), 776 F3d 453, 457 (7th Cir. 2014) notes the essential circularity in the definitions of "Related Documents" and "Indebtedness" substantially similar to the ones in the present adversary proceeding. Though these definition were not set out verbatim in the circuit court opinion, they were in the bankruptcy court opinion, In re Duckworth, 2012 WL 986766 (Bankr. C.D. Ill. 2012). *See, also*, In re Margues, 2008 WL 4286998 (Bankr. E.D. Pa. 2008) at *7.

exceedingly obscure. But, in parsing the meaning of Related Documents, I conclude the 2009 Security Agreement is **not excluded** by the integration clause; it is in fact **included**.

The parties have cited less than a dozen cases which even discuss the defined terms. None really address the issue of the integration clause, which is the key legal issue.[34] Nor have I found any in my independent research.

### 3.6. The 2009 Security Agreement Was Not Terminated by the 2011 Payoff

- The trustee's alternative argument is that the 2009 Security Agreement was terminated when the 2009 loan was paid off in 2011. The survival clause reads:

> **Survival of Representations and Warranties**.[35] All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

FNBA points out that Indebtedness includes Future Advances, so paying off the 2009 loan did not pay off the Indebtedness:

> **Indebtedness**.[36] The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

---

[34] In re Duckworth, 2013 WL 211231 (Bankr. C. D. Ill. 2013); In re Dumulao, 2011 WL 4501402 (9th Cir. BAP 2011); Pride Hyundai, Inc. v. Chrysler Fin. Co., L.L.C., 369 F.3d 603, 614-15 (1st Cir.2004); Matter of Kazmierczak, 24 F.3d 1020, 1021 - 22 (7th Cir.1994); Metropolitan Life Ins. Co. v. American National Bank & Trust Co., 682 N.E. 2d 72 (Ill.App. Ct. 1997); Universal Guaranty Life Ins. Co v. Coughlin, 481 F.3d 458 (7th Cir. 2007); In re Schmaling, 783 F.2d 680 (7th Cir. 1986).

[35] Exhibit A, page 4.

[36] Exhibit A, page 4 at the bottom under Definitions.

MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT    Page 17 of 19

Additionally, the trustee's interpretation of the Survival clause is called into question by the following perfection duty which is inconsistent with the trustee's conclusion:

> **GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL** With respect to the Collateral, Grantor represents and promises the Lender that:
> **Perfection of Security Interest**. Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender**.

Although the trustee says FNBA's interpretation will result in a never ending future advances obligation,[37] FNBA's literal reading of the Survival clause is correct. The payoff of the 2009 loan did not terminate the 2009 Security Agreement.[38]

**3.7. <u>Damages Under 11 USC § 553(b) Are Not Appropriate</u>**- The trustee concedes that if FNBA has a collateral or lien interest in Deposit Accounts the trustee cannot avoid the $1.3 million bank account sweep.

**4. <u>CONCLUSION</u>**- At the conclusion of the oral argument on May 9, 2016, I announced that I would hold that the integration clause in the 2013 Security Agreement excluded the 2009 Security Agreement. I started to write a memorandum to that effect, but after endlessly reading and rereading the Related Documents and Indebtedness clauses and trying to parse them to fit my original conclusion I found that I was probably wrong. The memorandum would not "write."

---

[37]Trustee's summary judgment brief. ECF No. 12, pages 20-21. And, trustee's reply brief. ECF 14, pages 9-13.

[38]<u>In re Alaska Fur Gallery, Inc.</u>, 457 B.R. 764, 774 (Bankr. D. Alaska 2011) (relying on the cross-collateralization and future advances clauses in the commercial security agreement).

The trustee presented a clever, well thought out argument, but one that the court cannot adopt. And, the inclusion of the 2009 Security Agreement as one of the Related Documents in the 2013 Security Agreement is subtle, if not obscure. But, in the end, that is what I think the contract says. A separate order will be entered.

DATED: May 31, 2016

/s/ Herb Ross
HERB ROSS
U.S. Bankruptcy Judge

Serve:
Cabot Christianson, Esq., for π
Dennis Fenerty, Esq., for ∆
Cheryl Rapp, Adv. Proc. Mgr.
United States Trustee

D7738

MEMORANDUM DECISION REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT